Next case is In re the marriage of Mowen, did I pronounce that correctly, for the appellant Mr. Ma'am Downey and for the athlete Mr. Schnock, you may proceed. May it please the court and opposing counsel. Your Honor, this case presents a marriage of 30 years with three grown children where the party married essentially out of high school and built a substantial marital estate. The trial court in this case decided to divide that marital estate essentially 50-50 but awarded virtually all of the assets to Mr. Mowen and awarded a rebalancing payment to my client over 15 years while awarding no maintenance. And while we've raised several issues with the trial court's judgment, this case basically comes down to a determination of Mr. Mowen's income and the trial court's determination with regard to that. That crucial issue pretty much determines the balance of the case. Now before getting into the specifics, just to touch on the standards of review that are applicable here. The trial court's decision in the divorce case is considered as a whole and it's reviewed for abuse of discretion. When the trial court takes evidence on an issue, that determination on that issue is generally under the manifest weight of the evidence standard. But if the evidence before the court is either unrebutted or uncontradicted, then this court applies to no overview to the trial court's determination. And as we've argued in our brief, the trial court's determination on Mr. Mowen's income was an abuse of discretion or rather was against the manifest weight of the evidence and erroneous as a matter of law. The two issues with the trial court's decision on Mr. Mowen's income, I guess first I should note, the trial court doesn't actually state a specific figure for Mr. Mowen's income. Instead, it listed his income from 2009 through 2012. And the trial court doesn't have to state a way of treating the income for a self-employed individual like a farmer. Now, when calculating that income, the trial court essentially just looked at Mr. Mowen's Schedule F income. He did not count the equipment sales that Mr. Mowen derived income from and did not count the full amount of the crop insurance proceeds that Mr. Mowen received. With regard to the equipment sales, the evidence before the court was uncontradicted with regard to Mr. Mowen's history of income from the sales of equipment in the course of his farming business. Mr. Mowen testified himself that he regularly attended equipment auctions. He purchased a computer for the purpose of viewing equipment auctions and admitted that that was part and parcel of his farming business. Now, he submitted no authority to this court to suggest that this court or the trial court should not have considered his equipment sales. His brief essentially says that it's overstated, but doesn't say how it's overstated. But when considering those equipment sales just by themselves, Mr. Mowen's average income over the time period the court cited in the judgment would have jumped from roughly $40,000 to roughly $77,000, almost double. When it comes to the crop insurance proceeds, Mr. Mowen admitted through his submission to his tax preparer that he received $188,000 in crop insurance proceeds for the 2012 crop year. When he was asked about it on the stand, he admitted that he received that amount. He didn't include it in his 2012 taxes because it wasn't actually received until after the calendar year 2012. But he admitted that he received that income before the trial began. He never stated that he didn't receive the $188,000. He said, yes, I received it. He said it went to pay debt. And whether it goes to pay debt or it goes into his pocket, it's still income to him and the trial court should have considered all of that income. Instead, the trial court essentially considered half of it, the $95,000 roughly check that he listed in his pretrial affidavit as being paid to First Farm Credit Services, one of his creditors. But that doesn't to his tax preparer and on the stand that he received the full $188,000. The trial court simply didn't count that, count the extra money. And as a result, Mr. Mowen's income was again averaged to $40,000 if you just include the crop insurance by itself, it goes to $63,000. If you include both the crop insurance and the equipment sales, Mr. Mowen's average income over that 2009 to 2012 period that the trial court was looking at goes from about $40,000 a year to about $100,000 a year. That is roughly two and a half, three and a half times what Mrs. Mowen's income was. That's a significant difference when you consider the trial court's overall determination in the case of a 50-50 split. Looking at an income distribution we found would justify a 50-50 split, or at least it's understandable. If, however, Mr. Mowen's income is properly calculated at roughly $100,000 a year, I don't believe that the cases support a 50-50 split with no maintenance and with an income disparity such as that one. Now the other errors that the trial court made in its judgment are relatively minor in comparison, although they all build towards the fact that when considering the judgment as a whole, it is an abuse of discretion. The misstatement of both Dean's own debt and the DSM activating business' debt, the understatement of Dean's debt, the overstatement of the DSM debt just resulting from a misread of the loan statements before the court, the jewelry classification. Mr. Mowen stipulated that part of the jewelry that was included was simply not the party's daughter's jewelry. They put it on their insurance coverage as a convenience to the kids. The truck. Both parties treated the truck as marital property. Depreciation was taken on the truck. There was just no question that this truck was marital property, and the trial court decided that it was not marital property and awarded it to the party's son. The method of distribution itself. The trial court used interest to replace maintenance. It found that Mrs. Mowen was entitled to maintenance and then didn't award it to her on the basis that the interest it awarded on the property distribution over time would supplement her or would supplant any need for maintenance. And as we've cited in our brief, I don't think that the cases support that kind of distribution. Interest on a property distribution award over time is compensation to the receiving party for the delay in receiving the full amount of the recompensating payment or rebalancing payment, and it's the cost to the paying party for the benefit of not having to pay the full amount immediately. By using interest in the way that it did, it essentially either is not compensating Mrs. Mowen for the delay in receiving payment, or it's depriving her of a maintenance entitlement, I suppose, that she would otherwise be receiving. The payment over 15 years, as we've cited in our brief, is a longer time period than any of the other reported cases that we were able to identify. And the trial court simply doesn't give any explanation as to why the additional burdens that a mortgage creates as opposed to a traditional judgment lien was necessary in this case. You look at all of these errors combined and looking at the trial court's judgment as a whole, the trial court's judgment is an with review of divorce judgments. Some judgments get reversed for a pure abuse of discretion, where the review in court seemingly just decides that the trial court's application of the factors to the facts before was simply wrong. In other situations, because of errors that are made by the trial court in its consideration of the various factors that are applicable, the review in court holds that the trial court abused its discretion, but I think what's probably more accurate a description is that the trial court wasn't able to apply its discretion because of the factual or legal errors made in its review of the factors before it. The maintenance issue in this case is essentially similar to the property issue. The determination of Mr. Mowen's income, the understatement of that income is what makes the maintenance award an abuse of discretion, the lack thereof. The court found that Mrs. Mowen was entitled to maintenance and then did not award it to her. Again, if Mr. Mowen's income is accurately stated at roughly $40,000, then a no however, when considering the total of Mr. Mowen's income and his average income over that time period that the trial court calculated at roughly $100,000 a year, again, with an income disparity such as that one in a marriage of this duration, given the factors that were presented to the court, including the standard of living the parties enjoyed, a maintenance award should have been made. Finally, with regard to the discovery sanctions issue, the decision that the trial court made with regard to discovery sanctions is simply an abuse of discretion. And it is so because the sanction that was ordered, the $550 attorney fee award, is extremely minor in comparison to the impact that the discovery I'd reserve any other time. We'll have additional time on rebuttal. Thank you, Your Honor. Mr. Schnock. Good morning. My name is Bruce Schnock. I'm here with my daughter, Casey, representing the appellate respondent. To criticize a trial court judge in my opinion, and I think you need to hear it, this matter was tried, this matter was over-tried for two years. No stone was left unturned. No witness was left unquestioned. Nothing was left undone. This court heard arguments on the case. This court took two to three months to, took a while to decide the case. This court was more than adequately informed. This court was more than prepared to make its decision. And this court made its decision. My client doesn't agree with the court's decision in the whole, but accepts it. Mr. Mondami's client apparently doesn't accept it at all. But the facts in this matter are very simple. And this divorce should have been very simple, but it wasn't. And for the life of me, I don't know why. There were no children. There was no custody. There was no visitation. There were no issues that make divorce an extended, protracted, expensive proposition. The problem that counsel has in my opinion is what I was told early on in my career. Lawyers can't change facts. And counsel doesn't like the facts that he was confronted with in this matter. But they are the facts and they were virtually all agreed upon. With regard to the valuation of the land, the court had to distribute the property. We got an appraisal on the land early on. My client paid for it. They didn't like it. They went out and got another appraisal. It was virtually the same as ours. A year later, they got another appraisal. It was within one percent of the first two. But we kept beating that horse to death. But the value of the with all other assets, the same can be said. With regard to debt, I thought we were in agreement on the debt. We had pounds of paper. We had the financing statements. We had the bank notes. We had the operating loans. Those were all marked. They were submitted to the court. The court had months to take those into consideration. The court made its determination as to the debt. This man was working on operating loans. He was working on credit. Every year he had to get a new The court apparently was arbitrary in its decision. The court ignored the law. The court's decision exceeds the bounds of reason, which I clearly don't agree with. What this court was faced with and what Mr. Mondami and his client didn't like was a situation that they were confronted with and my client was confronted with. At the time of this divorce, my client had lost his job, a good job as head of a local dairy that he had had for 30 years. The dairy closed. The dairy was torn down. It's now a vacant lot. I drive by it every day to work. So he had no hopes of getting that job back and he had no hopes of getting similar employment. He had exhausted all of his unemployment benefits. He had gotten extensions out of his employment benefits and those had been exhausted at the time of the hearing. He was trying to make a living farming a 130 acre farm that he and his wife acquired during the marriage and hiring himself out to do farming for neighbors or friends. At the time of this divorce, Adams County in the state of Illinois was going through probably the worst drought in its history. That is also unrebutted and agreed upon. He had no crops in storage. He had no money in the bank. His crop, his corn crop was making 8 to 20 bushels where he normally made 150 to 180. He was having to pay money to cut that corn down because it was of no use to him. So that $100,000 operating loan, not only could he not pay that back to the bank, it didn't generate any income. He did receive insurance proceeds. Those insurance proceeds weren't income. Those were an 80% reimbursement and on some of them they were 85 that went back to the bank. So he got to work all year and still lose money, including his costs. He wasn't even able to recoup his costs. This was the facts the council was confronted with. In addition, you talk about somebody walking around with a black cloud over their head. He suffered a broken back during this divorce. He didn't get work comp for that. He's a farmer. He required major back surgery. In addition, the parties, he and his wife, were being sued by one of their children. So that's the facts that this judge was confronted with. As far as Mr. Mondami's client, she was working at a job that paid $23,000 to $25,000 a year. She was working, and to characterize it as part-time is unfair to her. It would be a disservice to her. But she was working 32 to 34 hours. I asked her, would you ask for more work? I won't ask for more hours. Would you take more hours if they offered to you? No, I will not. Would you look for a job where you could get more hours? No, I will not. So she wasn't doing anything to become self-sufficient, and certainly the law places upon her a burden to become self-sufficient. Then to make matters more egregious, in my opinion, she had the nerve to ask for $40,000 a year in maintenance. Her demonstrated needs that were not attacked by me, because I didn't need to, were approximately $32,000 to $34,000 a year. Her income was $23,000 to $25,000, so she had a shortfall of $6,000 to $8,000 to $9,000 a year, assuming that her budget is legitimate, and I'm not here to argue that one way or the other. But she asked for $40,000. I guess her theory was, I'll take his $40,000, I'll take the excess, the $6,000 or $7,000, put it in my pocket, and take all of my check and put it in my pocket. That's not self-sufficiency with all due respect to Mr. Mondime and his client. That's plain simple greed. So first off, my client could not pay maintenance. He was not in a position to pay maintenance. Those are the unrebutted facts. She is not a candidate, I do not believe, a good candidate for maintenance, based upon the length of the marriage. Certainly she was. But based upon the facts that this court was confronted with at the time of this divorce, it wasn't realistic, especially when you consider what she was asking for. So to say that this court was arbitrary, to say that this court exceeded the bounds of reason, to say that this court ignored the law, which I believe is the standard that Mr. Mondime must meet, is just not fair to the court, and it's not fair to either of these parties, and it should be taken into consideration. To put the cherry on the sundae, at the time of this divorce, and again it's unrebutted, she had $52,000 of unaccounted for income. We don't know where it went. Based upon her income, based upon the work comp award that had been given to her, based upon money she had taken out of the bank when the parties separated. So again, that has never been addressed. Counsel, I believe, admits that this was a 50-50 split, I think it was. I think it was an equitable division, I think it was an equal division, fairly equal. My final point, I've always been told if you can't be part of the solution, don't be the problem. The trial judge gave counsel an opportunity to finish the closing arguments. Counsel, how do you want me to accomplish what you want me to do? You want $800,000, you want $40,000 in maintenance. How do I do that? Where does this come from? He couldn't do it. He didn't offer one solution to this court. We came back, do you have a solution? He had no solution to the court. I gave the court a solution. My solution to this court was set the equity. The court did not accept my figures. Okay. But the court, and I asked for a 3.5% payout or interest on the principal that she was awarded. The court made it 3.75. That's $18,000 a year that she will get in interest. Coupled with her income, that more than meets her needs. Did she get maintenance? No. But is she sufficient? Is she being taken care of? Can she live? Can she get on with her life? Can she survive the wars? She certainly can. Can he do that? It's difficult for him, but yes, he can do that, and that's what's happening. If she doesn't invade the principal that he pays her at all, at the end of this period of time, she will have more money than she started with. I don't know where anybody in this day and age can put half a million dollars in the bank and earn 3.75% and have it guaranteed by a first mortgage on real estate, which is what this lady has. So the long and the short of it is, when you can't give a solution to the court, don't criticize the court for what it does. And that's what we have here, and that's what I find most egregious about the fact that we are here at all. Finally, with regard to sanctions, counsel places a lot of reliance on Bradley. I was an attorney on Bradley. I know about Bradley. That gentleman lied in discovery, he lied in his pretrial memorandum, he lied in court, and when he got caught lying, he lied some more. And then when he finally couldn't lie anymore, he just shut up. And that did affect the outcome of that case. And severe sanctions were imposed, but even in that case, they were allowed to present evidence. The long and the short of it is, were there discovery abuses? Were we late? Yes, we were. Did the judge address those? Yes, he did. Did we accept those? We did. Did they affect the outcome of this case? Do they warrant consideration here? I certainly hope not. Thank you for your time, and if you have any questions, I'll do my best. Thank you. Rebuttal? Thank you, Ron. The fact is, the document is before this court, it was before the trial court. The trial court simply misread it. The valuation issue is a red herring. He states that we agreed on the value of all the property. There was no agreement on the value of all the property. There was agreement on the value of the real estate. Both appraisals were within roughly 1% of each other, I believe. But with regard to the personal property, there was significant dispute. And again, I'm not sure how that really impacts the rest of this case. I don't think the question that whether or not we agreed upon the value changes whether the trial court accurately calculated Mr. Mound's income or it didn't. With regard to the job loss, that job loss took place well before the divorce took place. He was still receiving unemployment during the course of the divorce, and that unemployment ran out. But that doesn't, and we didn't make any issue of whether or not the trial court included or didn't include his unemployment compensation. We're just looking at what income Mr. Mound was receiving from his farming operations. That income was roughly $100,000 a year, contrary to the trial court's finding, or at least implicit finding, of roughly $40,000 a year. With regard to crops and storage, he had some amount of crops and storage. It's a small amount. We're not going to dispute that, but to suggest that he had no crops and storage is simply inaccurate. With regard to the crop insurance issue, I still have not heard any reason to discount those funds as income. They're received by him. Yes, they were insured his income otherwise. I don't know that they're all that dissimilar from some form of unemployment compensation or disability compensation or what have you. It's money flowing into him to compensate him for his work. He paid for that insurance to cover him in case he was unable to farm the crops to that level. He was unable to. He received that money. Whether it goes to pay down debt or not doesn't change the fact that it's income. With regard to his ability to pay maintenance, I think it's certainly not unrebutted. I think this court has heard from us today in our brief and the trial court heard at length about our determination and our calculation of what Mr. Mound's income really was. That income supports and would have been able to support an award of maintenance in this case. Again, with regard to the unaccounted for funds that Mr. Mound talks about, the court addressed both parties' claims of dissipation and basically found that there was no dissipation, implicitly saying that any funds that were taken were used for a narrow purpose. This is not any unaccounted for funds. The trial court had that evidence and made its decision. I don't have anything further to add. Okay, thank you. I take this matter under advisement and stand in recess until 1 o'clock.